Damion D. D. Robinson (SBN 262573)
  dr@robinsonmarkevitch.com
David Markevitch (SBN 256163)
  dm@robinsonmarkevitch.com
ROBINSON MARKEVITCH & PARKER LLP
8430 Santa Monica Blvd., Suite 200
West Hollywood, California 90069
Tel. (213) 757-7778

WIGDOR LLP
Valdi Licul (Pro Hac Forthcoming)
vlicul@wigdorlaw.com
Meredith Firetog (Pro Hac Forthcoming)
mfiretog@wigdorlaw.com
William Baker (Pro Hac Forthcoming)
wbaker@wigdorlaw.com
85 5th Avenue, Floor 5
New York, NY 10003
Tel. (212) 257-6800
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| SERGIO GIANCASPRO; ALEXIS GERACI; and ADAKU IBEKWE, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>GBL CAPITAL COINVEST MASTER SÀRL; GBL CAPITAL PARTICIPATIONS SÁRL; SIENNA INVESTMENT MANAGERS LUXEMBOURG SA; and DOES 1-10,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR:**<br>1. **VIOLATION OF WARN ACT;**<br>2. **VIOLATION OF MINI-WARN ACTS;**<br>3. **FAILURE TO PAY WAGES;**<br>4. **FAILURE TO REIMBURSE;**<br>5. **FAILURE TO PAY WAGES DUE AT TERMINATION;**<br>6. **VIOLATION OF THE FLSA;**<br>7. **UNFAIR BUSINESS PRACTICES;**<br>8. **BREACH OF EMPLOYMENT CONTRACT;** |

9.  **BREACH OF SEVERANCE CONTRACT;**
10. **FAILURE TO PROVIDE WAGE STATEMENTS;**
11. **FRAUD; and**
12. **FAILURE TO PAY WAGES TIMELY (NYLL § 191);**

**DEMAND FOR JURY TRIAL**

Plaintiffs Sergio Giancaspro ("Giancaspro"), Alexis Geraci ("Geraci"), and Adaku Ibekwe ("Ibekwe") (collectively "Plaintiffs") on behalf of themselves and all others similarly situated, allege for their Complaint against Defendants GBL Capital Coinvest Master Sàrl (formerly Sienna Capital Coinvest Master Sàrl) , GBL Capital Participations Sárl (formerly Sienna Capital Participations Sárl), Sienna Investment Managers Luxembourg SA (formerly Sienna Capital Sàrl), and Does 1-10, inclusive (collectively, "Defendants" or "Sienna"), as follows.

## PRELIMINARY STATEMENT

1.    Plaintiffs file this action in an abundance of caution.  They have a separate action pending before this Court entitled *Tayler Ulmer, et al. v. StreetTeam Software, LLC, et al.*, Case No. 2:23-cv-2226-HDV (AGRx) ("Related Action"), arising from the same facts. They are concurrently seeking leave to amend to add Defendants herein as defendants in the Related Action. If leave is granted in the Related Action, Plaintiffs intend to dismiss this action.

2.    This case arises from the spectacular failure of an international music festival startup called "Pollen," which was likened to the British "Fyre Festival." The parent company of the Pollen enterprise was StreetTeam Software Limited ("StreetTeam UK"). StreetTeam UK had two wholly owned subsidiaries in the United States, Network Travel Experiences, Inc. ("NTE") and StreetTeam Software LLC ("StreetTeam"), which were fully dominated, controlled, and funded by StreetTeam UK. Plaintiff and putative class members were employees of the U.S. subsidiaries.

3.      In early 2022, Pollen's co-founders and president bragged that the company raised $150 million in funding from six well-known venture capital funds. This was in addition to the $100 million dollars it previously raised.  Pollen apparently used this huge influx of money to pay for, among other things, the "housing" and "entertainment" expenses of the Pollen's co-founders, Callum Negus-Fancey (Chief Executive Officer) and Liam Negus-Fancey (Chief Operating Officer).

4.      Sadly, in June 2022, Pollen stopped paying its hard-working employees. Nonetheless, it urged those employees to continue working, claiming that it was in the "final stages of negotiating a transaction" and promising that, once it did so, it would pay "all that you [the employees] are owed."  That never happened.  Instead, Pollen terminated Plaintiffs and scores of other employees after repeated inquiries about the late and missing paychecks.

5.      In the Related Action, Plaintiffs and other former employees sued NTE and StreetTeam, as well as the officers and directors responsible for the non-payment of wages and WARN Act violations, including the co-founders and president.

6.      Sienna was one of Pollen's major investors, primarily through a debt financing in April of 2022.  On information and belief, it demanded and received expansive control rights over the business. Exercising these control rights, it caused Pollen to engage in two rounds of mass layoffs in May and August of 2022 with the active participation of the Pollen officers and directors. It also caused Pollen to continue operating without paying staff in hopes that the company could effectuate a fire sale, also with the assistance of StreetTeam UK's board.  As a consequence of its *de facto* control and involvement in the non-payment and mass layoffs, Sienna is liable under applicable state and federal law.

7.      Plaintiffs bring this action to hold Sienna accountable for its role in causing the non-payment of wages earned by hundreds of employees, and mass layoffs without required notice.

COMPLAINT

**JURISDICTION AND VENUE**

8.    The District Court has original jurisdiction of this civil action pursuant to 28 U.S.C. § 1338(a) because this action arises, in part, under federal statutes including the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2102 ("WARN Act"), and the Fair Labor Standards Act, 29 U.S.C. § 201, et seq. ("FLSA").

9.    The Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

10.    Venue is proper under 28 U.S.C. § 1391(b) as a substantial part of the events giving rise to this case occurred in the Central District of California.

**PARTIES**

**Plaintiffs**

11.    Giancaspro is a lawful permanent resident of the United States and a resident of California.  Giancaspro worked for Defendants in the Los Angeles area. Defendants failed to pay Giancaspro his earned wages from July through August 10, 2022, and also failed to provide guaranteed employee benefits or reimburse his reasonable and necessary business expenses.  Without prior notice, on or about August 10, 2022, Defendants laid off Giancaspro effective immediately.  At all relevant times, Giancaspro met the definition of an "employee" and/or "eligible employee" under all applicable statutes.

12.    Geraci is a citizen and resident of New York.  She worked for the Corporate Defendants through August 10, 2022.  Defendants ceased paying Geraci's earned wages as of July 1, 2022, and discontinued guaranteed employee benefits and reimbursement of reasonable and necessary business expenses.  On or about August 10, 2022, Defendants laid off Geraci without warning or prior notice, effective immediately.  At all relevant times, Geraci met the definition of an "employee" and/or "eligible employee" under all applicable statutes.

13.    Ibekwe is a citizen and resident of California and worked for Defendants in the Los Angeles area at all relevant times.  On or about May 10, 2022, Defendants

- 4 -

laid off Ibekwe without prior notice or warning.  StreetTeam then entered into a severance agreement with Ibekwe, committing to pay her severance of $16,666.67.  Defendants have made no part of this severance payment.  On information and belief, Defendants had no intention of performing at the time they entered into the severance agreement.  At all relevant times, Ibekwe met the definition of an "employee" and/or "eligible employee" under all applicable statutes.

**Defendants in the Related Action**

14.    StreetTeam Software, LLC d/b/a Pollen is a Delaware limited liability company with its principal place of business in Henderson, Nevada, and is an affiliate of the business enterprise referred to herein and known as "Pollen."  StreetTeam operates in the United States under the business name "Pollen."  At all relevant times, Pollen met the definition of an "employer" under all applicable statutes.

15.    NTE is a Delaware corporation with its principal place of business in Los Angeles, California, and is an affiliate of the business enterprise referred to herein and known as "Pollen."  NTE also operates in the United States under the business name "Pollen."

16.    JusExperiences is a United Kingdom private limited company with its principal place of business in London, United Kingdom.  JusExperiences is also an affiliate of the business enterprise referred to herein and known as "Pollen."  It does business in the United States and abroad under that name.

17.    Callum Negus-Fancey is, on information and belief, a citizen and resident of London, United Kingdom.  He is the co-founder of the Entity Defendants and served as the Chief Executive Officer ("CEO") of their parent company, StreetTeam UK.  He also served as the CEO of Defendant StreetTeam.

18.    Liam Negus-Fancey is, on information and belief, a citizen and resident of London, United Kingdom.  He is the co-founder of the Entity Defendants and served at all relevant times as the Chief Revenue Officer ("CRO") of their parent company, StreetTeam UK.

19.     James Ellis is, on information and belief, a citizen and resident of London, United Kingdom.  Ellis served as the President of StreetTeam UK and the CEO, Chief Financial Officer ("CFO"), and Secretary of NTE.

20.     At all relevant times, the Individual Defendants served as directors of StreetTeam UK and at various times as directors of the Corporate Defendants.

**Defendants in this Action**

21.     Defendants are subsidiaries of Groupe Bruxelles Lambert ("GBL"), a publicly traded investment holding company.

22.     GBL Capital Coinvest Master Sàrl ("Sienna Coinvest"), formerly Sienna Capital Coinvest Master Sàrl, is a Luxembourg private limited liability company (société à responsabilité limitée), with its principal place of business in Strassen, Luxembourg. It is a subsidiary of GBL and makes and holds investments on behalf of that entity. At all relevant times, it was a major investor in the Pollen companies through StreetTeam UK.

23.     GBL Capital Participations Sárl ("Sienna Participations"), formerly Sienna Capital Participations Sárl, is a Luxembourg private limited liability company (société à responsabilité limitée), with its principal place of business in Strassen, Luxembourg. It is a subsidiary of GBL and makes and holds investments on behalf of that entity. At all relevant times, it was a major investor in Pollen through StreetTeam UK.

24.     Sienna Investment Managers Luxembourg SA ("Sienna Investment Managers"), formerly Sienna Capital Sàrl, is a Luxembourg public limited company (société anonyme), with its principal place of business in Strassen, Luxembourg.  At all relevant times, Sienna Investment Managers was a subsidiary of GBL and acted as the private investment management arm of that entity. Sienna Investment Managers was at all relevant times the entity that executed and managed the investments in Pollen on behalf of the two holding companies, Sienna Coinvest and Sienna Participations. Accordingly, Plaintiffs are informed and believe that Sienna

COMPLAINT

Investment Managers was responsible for the active direction of the Pollen business as alleged below.

25.    Plaintiffs are currently unaware of the true names and capacities of Defendants Does 1-10 and so name them under these fictitious names. On information and belief, Does 1-10 are other GBL affiliates who actively participated in the management of the Pollen entities as described in detail below. Accordingly, Plaintiffs are informed and believes that Defendants Does 1-10 are legally responsible for the acts and omissions alleged herein.

## ENTITY AND INDIVIDUAL LIABILITY

**I.    Single Enterprise and Alter Ego**

26.    "Pollen" was not a single business entity, but a global enterprise and "brand" used to promote events.  The enterprise operated through a complex web of an estimated 20-plus affiliated entities in the United States, the United Kingdom, and elsewhere, including the following in addition to NTE and StreetTeam:

        a.       Lets Go Crazy Limited

        b.       Lets Go Crazy Holdings Limited

        c.       Lets Go Crazy Music Limited

        d.       YourVine Limited

        e.       Freemavens Limited

        f.       The Physical Network Limited

        g.       The Physical Network LLC

        h.       Lets Go Group Limited

        i.       StreetTeam Software Limited

        j.       Beyond.Life Ltd

        k.       JusExperiences UK Limited (2019) d/b/a "Trippr," formerly Justours UK

        l.       Justours, Inc.

        m.       2504030 Ontario Inc.

n.    JusCollege Mexico

o.    2504031 Delaware Inc.

p.    Freelivin Entertainment, Inc.

q.    Ibiza International Music Summit SL.

27.    All of these entities operate using the same business name, "Pollen," through shared websites and offices.  All of them share combined business operations and management, share offices, and operate as mere constituent parts of the same enterprise, and a conduit for the business affairs of the others.  Most of these entities are presently dissolved, in insolvency proceedings, or have been closed.

28.    All of the operating Pollen entities, including NTE and StreetTeam, were beneficially owned and controlled by StreetTeam UK.  StreetTeam UK is, and at all relevant times was, dominated and controlled by its founders, Defendants Callum and Liam Negus-Fancey, who served as its officers and own a substantial share of the stock through a series of holding companies.  The entire Pollen enterprise operated under the direction of the London-based leadership team or "LT," headed by the Negus-Fancey brothers and Ellis.

29.    These entities have been formed and operated in a manner designed to obscure their true identities and the nature and scope of their operations, making it exceedingly difficult for employees and other creditors to collect on valid debts.  The Pollen entities and their officers and directors provided false and misleading information to both Plaintiffs and class members and governmental authorities as to which entity or entities employed various employees.

30.    Plaintiffs are informed and believe that Pollen also opened multiple other U.S. entities, shell companies, and holding companies, which have not yet been identified.

31.    Plaintiffs are informed and believe that all of the Pollen entities operated from shared offices and shared interlocking officers, employees, and managers, including the Negus-Fancey brothers and Ellis.  Each of the Pollen entities did

COMPLAINT

business in the United States as "Pollen."  The Pollen entities failed to observe basic corporate formalities and treated their affiliates interchangeably.  On information and belief, this included sharing of employees and resources, commingling and improper transfers of funds, and disregard of corporate formalities.  In addition, the Pollen entities were wholly undercapitalized, leading to the losses alleged herein.

32.     Employees in the United States were sometimes hired by one of the Pollen companies and then paid by another, or sometimes both.  Other employees received payroll from one entity but benefits from another.  Still others were paid in the United States by offshore affiliates.  In some instances, employees were designated for tax purposes as employees of "The Physical Network," an entity which no longer exists.

33.     The Negus-Fancey brothers and other company executives also used the Pollen entities for personal ends.  For example, they took substantial company funds for personal use in the form of excessive housing and relocation allowances, sham "entertainment" expenses, and the like.  In one instance, Mr. Negus-Fancey spent $60,000 in company funds on a Spanish villa for his wedding, writing it off as accommodations for "key clients."

34.     Parent entities in the corporate family and the founders themselves have held themselves out as being obligated for the debts of the U.S. subsidiaries.  For example, to receive an exemption from financial reporting requirements, StreetTeam UK—which is insolvent—purported to guarantee all of the debts of JusExperiences.  In addition, StreetTeam UK's primary secured lender claims that all its subsidiaries guaranteed the debts of StreetTeam UK.  Likewise, when the company discontinued normal payroll in June 2022 and paid employees by wire, Liam Negus-Fancey reported that the founders had "underwritten" this wire.  In another instance, Ellis reported that he had personally made payroll payments.

35.     The Pollen entities and their officers and directors, including the founders, made numerous material misrepresentations to employees about the

financial condition of the entities to induce them to continue working without pay. They did so knowing that the entities were insolvent and would be unable to pay payroll and benefits as promised.  In addition, the Individual Defendants continued to take money out of the company despite being unable to make payroll, prioritizing payments to themselves above employees' earned wages.  In addition, the individual officers and directors actively diverted and dissipated funds and revenue in which Plaintiffs and class members hold a priority, secured claim, using this web of offshore affiliates.

36.    The Pollen entities, thus, operated as a single enterprise and alter egos under applicable law.

## FACTS COMMON TO ALL CLAIMS

**I.    Pollen's Rise as a Producer of High-End Music Festivals**

37.    Founded in 2014, Pollen billed itself as a leader in producing high end music festivals, college trips, and other events around the world.

38.    It offered events in exotic destinations, featuring superstar entertainers of the likes of Justin Bieber and 50 Cent.  Customers purchased event access and accommodations ranging well into the thousands of dollars per guest.  Pollen reported that over 400,000 people travelled around the world to attend its events.

39.    Over its history, Pollen purportedly raised over $200,000,000 in investment capital from various sources, including prominent venture capital funds and the British government's Future Fund.

40.    Through its U.S. affiliates NTE and StreetTeam, Pollen hired Plaintiffs and hundreds of other full-time employees in the United States.  All or substantially all of these employees worked remotely.

**II.    Pollen Faces Financial Distress**

41.    Despite raising massive amounts of money, Pollen badly mismanaged its finances to the detriment of its investors, customers, and employees.  The company lost over $150,000,000 between 2019 and 2021.  Unbeknownst to employees, Pollen

stayed afloat during 2019 through 2021 by taking large loans and outside financing.

42.    In 2021 into 2022, Pollen cancelled multiple events, sometimes days before they were set to start, and at least once, after guests had already arrived. Customers reported publicly that Pollen either persistently delayed in refunding payments for cancelled events, or failed to refund them altogether, prioritizing refunds for those who complained publicly on social media.  On information and belief, Pollen lacked funds to make full refunds to customers, and was reliant on selling new events to secure funds needed to refund customers on past events.

43.    During this period, Pollen routinely failed to pay vendors in a timely manner.  On information and belief, on more than one occasion, customers would arrive at a hotel that they had booked and paid for through Pollen, only to learn that Pollen had never purchased their accommodations.

44.    Beginning in late 2021, Pollen consistently missed its payroll schedule. Each time, the company would blame logistical issues, such as Pollen's payroll processor, TriNet.

45.    In April of 2022, Pollen announced publicly and internally that it had raised $150,000,000 in investor capital.  These representations were false.  Later public filings show that Pollen only brought in approximately $1,000,000.  The rest was used to retire or convert large outstanding debts that Pollen had amassed during 2019 through 2021.

46.    On May 10, 2022, Pollen laid off 200 employees, representing approximately one third of its workforce.  At that time, the company claimed that these layoffs were a one-time cost-cutting measure agreed upon with the investors.

47.    In May 2022, Pollen charged customers $3.2 million early for upcoming events through its payment-processing software.  The company claimed that this was "accidental," due to a software glitch.  Rather than reverse the transactions, however, the company offered to make refunds to customers within 30 days or to give them a credit if they allowed the company to keep the early payment.

48.     Pollen fired its CFO on May 18, 2022 without explanation.  On information and belief, the company was also facing whistleblower reports of financial mismanagement and embezzlement.

49.     On May 19, 2022, Pollen hosted a companywide town hall meeting for employees in which company leadership continued to reassure employees.  During this meeting, company director Leila Rastegar Zegna sang the praises of the company founders and told employees companywide that she continued to believe in the company's vision.  Unbeknownst to employees, Ms. Zegna had formally resigned her board position the previous day.

50.     According to later company filings, all of Pollen's outside directors— many of them investor representatives—left the company *en masse* between May and June 2022.  Plaintiffs are informed and believe that in the summer of 2022, one of Pollen's major investors wrote its investment holdings down to zero.

51.     In July of 2022, Pollen engaged investment bank Goldman Sachs to locate a buyer for its entire operation.  These efforts were unsuccessful.

52.     Throughout this time, Pollen's senior management, including CEO Callum Negus-Fancey, continued to use company funds for personal expenses, such as a company car, housing and relocation allowances, purported client entertainment, and the like.

## III.   Pollen Fails to Pay Its Staff or Provide Benefits

53.     Despite its increasing financial distress, Pollen senior management continued to represent to employees that their jobs were secure and that Pollen would have no problem making payroll.  It continued to make these representations into July and August 2022.  When directly confronted by employees about Pollen's financial condition, company leadership assured them (including in writing) that they would receive all they were owed.

54.     The Pollen companies entered into severance agreements with many of the employees laid off in May 2022.  They never made good on their severance

contracts.  As to many laid off employees, the Pollen entities made none of the required payments, breaching their severance contracts.

55.    The Pollen entities again missed payroll on June 30, 2022.  When questioned about this missed payment and the company's financial stability, Pollen's co-founder and CEO, Callum Negus-Fancey, represented that the delay was due to Pollen "closing a transaction with a large, well-known entertainment company," and was "an isolated, one-off event."  When questioned about whether Pollen would meet payroll going forward, he responded:  "Yes, absolutely we can."

56.    Throughout June, July, and August of 2022, senior management, including Callum Negus-Fancey and Chief People Officer Anne Bedi at his direction, continued to make similar misrepresentations to employees, representing that their jobs were secure, that they would be paid, and that normal payroll would resume within days.  Callum Negus-Fancey represented that missed payroll would "never happen again."  Ms. Bedi also represented that all employee benefits were still being handled through TriNet and were unaffected by the short-term issues.

57.    These representations were knowingly false.  At the time of the representations, Pollen's management, including Callum Negus-Fancey, knew that Pollen lacked funds to pay past-due wages to employees and had no reasonable prospect of doing so.  In addition, Defendants had terminated employees' medical insurance and 401(k) benefits through TriNet in June 2022 without telling them.

58.    In early and mid-July, Defendants made a payment to U.S. employees via wire transfer rather than their ordinary payroll process, reflecting the pay period through June 30.  Pollen paid employees net pay, reflecting deductions for benefits and 401(k) contributions.  The companies, however, never made the required benefits contributions.

59.    After the wire-transfer, Pollen paid employees no further wages.  They paid employees nothing for the period from July 1 to August 10, 2022.  Instead, the companies have since acknowledged that many employees are due wages "in arrears"

for this period and are "creditors" of the company.

60. The Pollen entities also secretly cancelled employee benefits in June 2022. Employees learned in early August that they had been without medical insurance for weeks. Some learned only after having received medical treatment during that period. In addition, 401(k) contributions, including company contributions and those of employees, were removed from employees' accounts due to the Pollen entities' failure to fund.

## IV. Pollen Engages in Mass Layoffs Without Notice

61. On August 9, 2022, Pollen announced that it was entering administration in the United Kingdom and had retained Kroll to restructure its operations. StreetTeam UK formally commenced administration on August 16.

62. On August 10, 2022, the Pollen companies notified hundreds of remaining employees, including Plaintiffs, that they were being made "redundant"— *i.e.*, laid off—effective immediately. It did not give them 60 days' notice as required by the WARN Act or state equivalents. Nor did it pay them their final wages due on termination, inclusive of vacation and other compensable time.

63. Defendants have paid none of the wages owed for the period after the layoffs due to the inadequate notice.

## V. The Investor Defendants Control the Pollen Enterprise

64. Sienna Participations and Sienna Coinvest were at all relevant times major debt and equity investors in StreetTeam UK.

65. In or about December of 2021, StreetTeam UK entered into a major equity financing, referred to as its "Series C" financing, by which it raised almost $54 million in investment capital and converted a large amount of debt. Sienna Coinvest invested almost $30 million in the financing. On information and belief, the investment was negotiated and executed on behalf of Sienna Coinvest by Sienna Investment Managers, then doing business as "Sienna Capital."

66. The Series C financing was reflected in, among other instruments, an

Amended and Restated Subscription and Shareholders' Agreement ("SSA") as well as amended Articles of Association of StreetTeam UK. Individually and in combination, these instruments gave the Investor Defendants and other major investors certain rights with respect to the company's operations.

67.    Among other things, Sienna Coinvest received the right to appoint a member of StreetTeam UK's board of directors. StreetTeam UK was required to have approval from various classes of investors directors for material transactions, including the grant of salaries or bonuses in excess of $250,000, hiring or firing the CEO, any borrowings of over $250,000, and any material change to the company's business.  The SSA required the formation of a "Remuneration Committee" to approve compensation of Pollen's employees, with investor appointees comprising half of the committee, and with the terms of reference and governance of the committee to be approved by the major investors.

68.    As alleged above, the Pollen group of companies continued to face severe financial difficulties after this investment and apparently failed to raise the full amount of investment needed to continue operating.  As a result, the Investor Defendants were able to extract major concessions and control rights as a condition of providing further funding in April of 2022.

69.    At that time, in an effort to keep the business afloat, Pollen raised a further round of financing pursuant to a series of convertible loans (the "Convertible Debt Financing") from Sienna. Although other investors eventually joined, Sienna Coinvest was by far the largest investor in the Convertible Debt Financing, lending $26 million between April and June of 2022. On information and belief, based on the transaction documents, the Convertible Debt Financing was negotiated and executed on behalf of the Investor Defendants by Sienna Investment Managers, then doing business as "Sienna Capital."

70.    As set forth in the Summary of Terms and later documented in a series of formal agreements, the Convertible Debt Financing gave the Investor Defendants

COMPLAINT

significant control rights and made them Pollen's senior unsecured creditor.  In addition, StreetTeam UK gave the Sienna warrants to purchase shares for £0.0001 to ensure that at all times they held at least 30% of the equity of StreetTeam UK.

71.     Among other things, the Investor Defendants requested and received changes to StreetTeam UK's governing documents, including the SSA, giving the Investor Defendants effective control of StreetTeam UK's board. The relevant agreements gave the Investor Defendants the right to appoint three of the five investor directors of the company, meaning that (a) their vote was necessary to approve any matter requiring investor director approval, and (b) they could outvote any other investors with respect to such matters. To facilitate this, Pollen's other major investors were required to cede board rights, which they begrudgingly did.

72.     In addition, the transaction provided that any matter requiring investor approval could be unilaterally approved either by StreetTeam's board (on which Sienna held three of five investor seats) and/or the Investor Defendants unilaterally. As a condition of making the loan, the Investor Defendants also required StreetTeam UK to agree to obtain their written approval before making "any single item of Group Company expenditure of US$50,000 or more."

73.     These rights, which the Investor Defendants were able to extract due to StreetTeam's desperate need for capital and failing financial condition, gave them the right to exercise pervasive control over the business. For one thing, it meant that the Investor Defendants could control the Remuneration Committee, which set employee compensation companywide.

74.     Consistent with the broad rights provided in the investment agreements, on information and belief, the Investor Defendants immediately began making significant changes to Pollen's operation, including taking control of Pollen's board, terminating or effectively terminating the other investor directors, and directing the company to make the May 2022 layoffs, discussed above. Pollen's existing officers and directors actively participated in and facilitated these layoffs as well, including the

founders and president of StreetTeam UK.

75.    At the same time, on information and belief, Sienna demanded that Pollen appoint a restructuring consultant, Alix Partners, to restructure the business, and directed the officers of the company to sell the business. On information and belief, Sienna personally selected Goldman Sachs to run the sale process immediately or shortly after the April 2022 fundraising.

76.    As noted above, by July of 2022, Pollen's entire board had resigned, except for the Individual Defendants. As a result, on information and belief, the board lacked a quorum. StreetTeam UK, through the founders and president, began taking instruction from Sienna about how to operate the business, including the business of the Entity Defendants, and carrying out those instructions in their capacity as officers of the company.

77.    Among other things, despite knowledge that Pollen was not paying staff and could not pay staff, on information and belief, Sienna directed StreetTeam UK to continue operating the business in order to pursue the ongoing sales efforts.

78.    Plaintiffs are further informed and believe that following the failure of those sales efforts, Sienna was also directly involved in and directed the decision to shutter the companies and make the second round of mass layoffs in August of 2022, which the officers and directors again carried out.

79.    At minimum, through its direct participation in the operations of the Pollen companies during the period of July 1, 2022 and August 10, 2022, Sienna conspired with and aided and abetted the companies and their officers and directors in failing to pay wages, benefits and reimbursements, as alleged herein, and engaging in mass layoffs without adequate notice in violation of the WARN Act. Minimally, Sienna agreed with the Pollen companies to continue operating without paying employees, and to engage in two rounds of layoffs without prior notice, intending for the Pollen companies to do so.

COMPLAINT

## CLASS AND COLLECTIVE ACTION ALLEGATIONS

80.    The Court in the Related Action, by way of an Order Certifying Class dated December 19, 2024, certified the following class and subclasses:

**Wage Class**: All U.S.-based employees of Defendants StreetTeam Software, LLC d/b/a Pollen and Network Travel Experiences, Inc. (collectively, "Defendants") in the United States from July 1, 2022 through August 10, 2022 and who did not receive wages, benefits, or expense reimbursements for said period.

    1.    **New York Wage Subclass**: All members of the Wage Class who were protected under the New York Labor Law during July 1, 2022 through August 10, 2022.

    2.    **California Wage Subclass**: All members of the Wage Class who were protected under the California Labor Code during July 1, 2022 through August 10, 2022.

    3.    **Nevada Wage Subclass**: All members of the Wage Class who were protected under Nevada wage laws, including Nevada Revised Statutes, Chapter 608, during July 1, 2022 through August 10, 2022.

**Layoff Class**: All U.S.-based employees of Defendants who were laid off from May 2022 through August 2022.

    1.    **Severance Subclass**: All members of the Layoff Class who had in place an agreement for payment of severance.

81.    The Court also certified the Related Action to proceed as an FLSA collective action. (*Id.* at p. 9).

82.    A true copy of the Order Certifying Class is attached as Exhibit 1 and incorporated by reference.  Plaintiffs seek class certification of the same classes in this action on the same grounds set forth therein.

## FIRST CAUSE OF ACTION

### (Violation of the WARN Act)

### *On Behalf of Plaintiffs and the Layoff Class Against All Defendants*

83.    Plaintiffs repeat and reallege each of the foregoing allegations as though fully set forth herein.

84.    NTE and StreetTeam qualify as an employer under the WARN Act.  It employed more than 100 full-time employees in the United States who had been

- 18 -

employed for at least six months of the 12 months preceding the layoffs.

85.     The WARN Act, 29 U.S.C. § 2102, required NTE and StreetTeam to provide at least 60 days prior written notice of termination, or to provide notice as soon as practicable, to all affected employees, explaining why 60 days' notice was not given.

86.     NTE and StreetTeam engaged in a series of layoffs of Plaintiffs and other members of the Layoff Class in May and August 2022, which qualified for a 60-day warning under the WARN Act.  They terminated most employees staffed at their primary Los Angeles office, reflecting more than 33% of their workforce overall, more than 33% of the workers staffed from the Los Angeles office, and over 50 employees.

87.     NTE and StreetTeam failed to provide the required WARN Act notices to Plaintiff or other members of the Layoff Class.  Defendants also failed to pay Plaintiffs or other similarly situated employees their wages, salary, benefits, and accrued vacation during the 60 working days following their terminations.  On information and belief, NTE and StreetTeam also failed to give required notice to the appropriate state dislocated worker unit or other appropriate government agencies.

88.     Plaintiffs and other similarly situated employees have been damaged by this failure and are entitled to back pay and associated benefits for the 60-day period following their respective terminations.

89.     Defendants are liable for these violations because Defendants exercised *de facto* control over the Pollen enterprise and, on information and belief, made the decision to engage in the mass layoffs without adequate notice.

## SECOND CAUSE OF ACTION

### (Violation of the State Mini-WARN Acts)

### *On Behalf of Plaintiffs and the Layoff Class Against All Defendants*

90.     Plaintiffs repeat and reallege each of the foregoing allegations as though fully set forth herein.

91.     The Pollen entities' primary office in the United States was in Los Angeles, California.  Although many employees worked remotely during the COVID-19 pandemic, all or substantially all of them were staffed through the Los Angeles office.  Pollen's Los Angeles headquarters constitutes a "covered establishment" or worksite with respect to all employees staffed through that office.

92.     NTE and StreetTeam are a qualifying employer under the "mini-WARN" acts of California, Illinois, New York, the City of Philadelphia, as well as other states and municipalities, having employed 75 (or, in New York, 50) or more employees during the 12 months preceding the mass layoffs alleged herein.

93.     NTE and StreetTeam engaged in mass layoffs in May and August 2022, including laying off 50 or more employees, comprising more than one third of the employees.

94.     NTE and StreetTeam failed to give 60 days' (or, in New York, 90 days') advance written notice of the layoffs as required and have not paid employees any wages or benefits for the days following the layoffs.

95.     Plaintiff and other similarly situated employees have been damaged by this failure and are entitled to back pay and associated benefits for at least 60-day period following their respective terminations.

96.     Defendants herein are liable for the foregoing violations because they exercised control of the business enterprise at the time of the mass layoffs and, on information and belief, made the decision to engage in the mass layoffs.

**THIRD CAUSE OF ACTION**

**(Failure to Pay All Wages)**

***On Behalf of Plaintiffs and the Wage Class Against All Defendants***

97.     Plaintiffs repeat and reallege each of the foregoing allegations as though fully set forth herein.

98.     NTE and StreetTeam were the employer and joint employers of Plaintiffs and other members of the Wage Class.  Defendants herein qualify as "employers"

under relevant state law because they exercised control over the Pollen enterprise, including control over wages, hours, and working conditions.

99.    Defendants were required, pursuant to state laws and common law to pay Plaintiffs and members of the Wage Subclass all wages earned during the course of their employment, including, at least, minimum wage and overtime.

100.    The requirement to pay earned wages when due was imposed by both common law and state labor statutes, including the following:

| State | Statutes |
|-------|----------|
| California | Cal. Lab. Code §§ 201, 204, 510, 1194, 1197, and 1198. |
| Florida | Fl. Const. Art. X, Sec. 24; Fla. St. §§ 448.01(2), 448.110, and common law. |
| Georgia | Ga. St. § 34-4-3, |
| Illinois | 820 ILCS 105/4, 105/4a, 115/3, 115/4 |
| Massachusetts | Mass. Gen. Laws, ch. 149 § 148, ch. 151 §§ 1, 1A. |
| Missouri | Mo. Rev. St. § 290.080, 290.502, 290.505 |
| Nevada | N.R.S. 608.016, 608.018, 608.020, 608.060, 608.080, 608.195, and 608.250. |
| New York | N.Y. Lab. Law § 191, 193, 652, and 656, and New York State Minimum Wage Orders |
| Rhode Island | RI St. §§ 28-12-3, 28-12-4.1, 28-14-2.2. |
| Texas | Tex. Lab. Code § 61.011, 61.013, 61.014, 61.016, 61.017, 61.051 |
| Washington, DC | DC Code §§ 32-1003, 32-1302, and 32-1304. |

101.    NTE and StreetTeam failed to pay Plaintiffs and other members of the Wage Subclass all their earned wages when due.  NTE and StreetTeam consistently failed to pay employees on the regular paydays from December 2021 through August 2022 and failed to pay employees any wages for the period after June 30, 2022

through their terminations.  NTE and StreetTeam also failed to pay employees' final wages upon termination or thereafter.

102.   As a result of these acts, Defendants also necessarily failed to pay Plaintiffs and members of the Wage Class minimum wage for all hours worked and appropriate overtime.

103.   As a result of Defendants' failure to pay Plaintiffs' and class members' earned wages, Plaintiffs and class members have suffered damages in an amount to be proven at trial.  Plaintiffs and other class members are entitled to recover unpaid wages, minimum wage, and overtime, interest thereon, penalties, and liquidated damages.

## FOURTH CAUSE OF ACTION

### (Failure to Reimburse)

### *On Behalf of Plaintiffs and the Wage Class Against All Defendants*

104.   Plaintiffs repeat and reallege each of the foregoing allegations as though fully set forth herein.

105.   Defendants were the employer and joint employers of Plaintiffs and other members of the Wage Class.  Each of the Individual Defendants is liable for the acts and omissions alleged below as persons acting on behalf of an employer within the meaning of state law.

106.   NTE and StreetTeam, and by extension, Defendants, were required to reimburse Plaintiffs and other members of the Wage Class for their reasonable and necessary business expenses pursuant to common law and the following statutes:

| State | Statutes |
|---|---|
| California | Cal. Lab. Code § 2802 |
| Illinois | 820 ILCS 115/9.5 |
| Missouri | Mo. Rev. St. § 320.215 |
| New York | N.Y. Lab. Law § 198-C. |
| Washington, DC | DC Admin. Code, Rules 7-908, 7-909, and 7-910 |

107.    Plaintiffs and other members of the Wage Class incurred reasonable and necessary expenses in direct consequence of the discharge of their duties and obedience to the directions of Defendants.

108.    NTE and StreetTeam, and by extension, Defendants, have failed to reimburse any such expenses after June 30, 2022 if not earlier.

109.    Defendants' failure to reimburse Plaintiffs' and class members' reasonable and necessary business expenses has harmed Plaintiff and class members in an amount to be proven at trial.

### FIFTH CAUSE OF ACTION

**(Failure to Pay Wages Due at Termination)**

***On Behalf of Plaintiffs and Wage Class All Defendants***

110.    Plaintiffs repeat and reallege each of the foregoing allegations as though fully set forth herein.

111.    Defendants were the employers and/or joint employers of Plaintiffs and members of the Wage Class within the meaning of applicable state law.

112.    NTE and StreetTeam, and by extension, Defendants, were required to pay employees all wages due immediately upon termination, inclusive of vacation time and other accrued, compensable time, pursuant to state labor laws, including:

| State | Statutes |
|---|---|
| California | Cal. Lab. Code § 201. |
| Illinois | 820 ILSC 115/5 |
| Massachusetts | Mass. Gen. Laws, ch. 149, § 148 |
| Missouri | Mo. Rev. St. § 290.110 |
| Nevada | N.R.S. 608.020, 608.030, 608.040. |
| New York | N.Y. Lab. Law §§ 191, 193 |
| Rhode Island | RI St. § 28-14-14 |
| Tennessee | Tenn. Code § 50-2-103 |
| Texas | Tex. Lab. Code § 61.014 |

COMPLAINT

| Washington, DC | DC Code § 32-1303 |

113.   NTE and StreetTeam terminated Plaintiffs and members of the Wages Class in May and August 2022.  NTE and StreetTeam, and by extension, Defendants, failed to pay any of them their final wages, vacation, or other accrued compensable time at that time or thereafter.

114.   Defendants' failure to pay Plaintiff and other class members their final wages promptly upon termination was willful.  Defendants have no valid excuse for their failure to pay departing employees' final wages and failed to pay these final wages intentionally and willfully.

115.   As a result of Defendant's failure to timely pay Plaintiffs and other class members their final wages, Plaintiff and other class members have been damaged in an amount to be proven at trial.  Plaintiff and other class members are also entitled to statutory penalties and liquidated damages.

## SIXTH CAUSE OF ACTION

### (Violation of Fair Labor Standards Act)

*On Behalf of Plaintiffs and the Collective Action Members Against All Defendants*

116.   Plaintiffs repeat and re-allege each of the foregoing allegations as though fully set forth herein.

117.   Plaintiffs expressly consent in writing to be parties to this action pursuant to 29 U.S.C. § 216(b).

118.   Plaintiffs are subject to "Enterprise Coverage" under the FLSA on the grounds that the Pollen entities, which are aggregated for purposes of FLSA coverage, have done an annual dollar of volume of sales or business of at least $500,000. Further, Plaintiffs are covered under the FLSA on the grounds that their employment and job duties regularly and consistently involved interstate commerce through interstate, online sales of event admission and lodging and online event promotion.

119.   As alleged in detail above, during 2022, NTE and StreetTeam, and by extension, Defendants, repeatedly failed to pay employees, including Plaintiffs and

Collective Action Members, in a timely manner on regular paydays.  In addition,
Defendants failed to pay any of the Collective Action Members between July 1, 2022
and their dates of termination.

120.   NTE and StreetTeam necessarily failed to pay Plaintiffs and other
Collective Action Members federally mandated minimum wage and overtime by
virtue of their failure to pay their wages.  This conduct violates and continues to
violate the FLSA, including 29 U.S.C. §§ 206, 207 and 215.

121.   The foregoing conduct constitutes a willful and bad faith violation of the
FLSA within the meaning of 29 U.S.C. § 255(a).

122.   Due to the foregoing violations, Plaintiffs and Collective Action
Members, are entitled to recover from Defendants their unpaid wages, overtime, an
additional amount equal to wages and overtime as liquidated damages, and other
remedies.

## SEVENTH CAUSE OF ACTION

### (Unfair Business Practices)

***On Behalf of Plaintiff and the California Wage SubclassAgainst All Defendants***

123.   Plaintiffs repeat and reallege each of the foregoing allegations as though
fully set forth herein.

124.   Defendants engaged in unfair and unlawful business practices against
Plaintiffs and other members of the California Subclass, including (a) failure to pay
earned wages, failure to pay minimum wage and overtime under the California Labor
Code and the FLSA, (b) failure to pay wages due on termination, (c) failure to provide
proper notice of layoffs under the WARN Act and Cal-WARN Act, (d) failure to fund
insurance premiums as promised; (e) fraudulently representing to employees that they
would continue to receive wages and were continuing to receive health coverage and
401(k) benefits when they were not; (f) entering into fraudulent severance agreements
with no intention to perform; (g) failure to reimburse reasonable and necessary
business expenses; and (h) failure to provide accurate itemized wage statements as

- 25 -

1    required by California Labor Code § 226.

2        125.   This conduct amounted to unlawful business acts and practices under

3    California Business & Professions Code § 17200 in that it violated multiple state laws

4    and regulations as described in detail below.

5        126.   The conduct amounted to unfair and fraudulent conduct under California

6    Business & Professions Code § 17200.  The Pollen entities, acting under the control of

7    Defendants, falsely assured Plaintiff and other class members that they would receive

8    their past due wages, and had nothing to worry about regarding payment of wages.

9    They also assured Plaintiff and class members that they were continuing to receive

10   insurance and other benefits, and actively concealed the fact that they had terminated

11   employee benefits.  The Pollen entities engaged in this conduct, acting under the

12   control of Defendants, to induce employees to continue working without pay or

13   benefits.  Defendants further entered into severance agreements with certain

14   employees, in order to avoid employee lawsuits and keep up the ruse that Defendants

15   were operating a viable business, with no intention to perform.  Defendants' conduct

16   amounted to theft of labor.  The benefit to Defendants of this conduct was

17   substantially outweighed by the harm to employees who continued to work in reliance

18   on false representations without receiving compensation, and who failed to receive

19   benefits to which they were entitled.

20       127.   Plaintiff and other members of the California Subclass have lost money

21   or property by virtue of these unlawful business acts and practices, including vested

22   and earned wages, reimbursement of expenses, benefits to which they were entitled,

23   and guaranteed severance, as required under California Business & Professions Code

24   § 17204.  These wages, benefits, and severance, were vested and constituted a

25   property right of employees as provided in California law.

26       128.   Accordingly, Plaintiff and other members of the California Wage

27   Subclass are entitled to restitution of the vested and earned wages, minimum wage,

28   final wages, overtime, reimbursement, and benefits, which Defendants have

unlawfully failed to provide them.

## EIGHTH CAUSE OF ACTION

### (Tortious Interference with Employment Contract)

### *On Behalf of Plaintiffs and the Wage Class Against All Defendants*

129.    Plaintiffs repeat and re-allege each of the foregoing allegations as though fully set forth herein.

130.    NTE and StreetTeam entered into a series of employment agreements with Plaintiffs and members of the Employee Class on standard terms (the "Employment Agreements").  The Employment Agreements generally took the form of standard written contracts.  Other employees had oral or implied contracts based on their performance of services in exchange for compensation. The Employment Agreements were binding and enforceable and required NTE and StreetTeam, among other things, to pay Plaintiffs and members of the Employee Class agreed-upon wages, to provide the benefits, including health insurance benefits and 401(k) contributions, and to reimburse reasonable and necessary business expenses.

131.    Defendants were aware of these contracts, having a representative on the StreetTeam UK board of directors, having performed due diligence in connection with their investments, and being in regular contact with StreetTeam UK's directors and officers at relevant times.

132.    Defendants interfered with these contracts by failing and refusing to approve the expenditure of funds necessary to pay employees' wages and benefits, and by encouraging and causing the Pollen enterprise to continue operating without paying wages and benefits.

133.    This conduct resulted in a breach of the relevant contracts through the failure to pay wages and benefits.

134.    The breach of the relevant contracts directly and proximately caused Plaintiffs and class members damage.  Defendants conduct was a substantial factor in causing this harm.

## NINTH CAUSE OF ACTION

### (Tortious Interference with Severance Contract)

***On Behalf of Plaintiff Ibekwe and the Severance Subclass Against All Defendants***

135.    Plaintiffs repeat and re-allege each of the foregoing allegations as though fully set forth herein.

136.    Plaintiff Ibekwe and members of the Severance Subclass entered into binding severance agreements (the "Severance Agreements") with StreetTeam and NTE by which they agreed to release claims against Defendants in exchange for severance payments.

137.    Defendants were aware of these contracts. On information and belief, Defendants caused the round of layoffs that resulted in these severance contracts. On information and belief, Defendants were also aware of these contracts by virtue of having conducted due diligence in connection with their investment rounds, having one or more appointees on the StreetTeam UK board, and being in regular contact with officers and directors during the relevant period.

138.    Defendants interfered with these contracts by failing and refusing to approve the expenditure of funds necessary to pay severance.

139.    This conduct resulted in a breach of the relevant contracts through the failure to make severance payments.

140.    The breach of the relevant contracts directly and proximately caused Plaintiffs and class members damage.  Defendants conduct was a substantial factor in causing this harm.

## TENTH CAUSE OF ACTION

### (Failure to Provide Accurate Itemized Wage Statements)

***On Behalf of Plaintiffs and the California Wage Subclass Against All Defendants***

141.    Plaintiffs repeat and reallege each of the foregoing allegations as though fully set forth herein.

142.    Pursuant to California Labor Code § 226(a), NTE and StreetTeam were

required to provide Plaintiffs and members of the California Wage Subclass accurate, itemized statements on at least a semi-monthly basis, including the following gross wages earned; all deductions; net wages; inclusive dates of the pay period; and the name and address of the legal entity that was their employer.

143.   NTE and StreetTeam willfully and repeatedly violated section 226.  They failed to properly identify the legal name of Plaintiffs' and class-members' employer, including by using erroneous corporate names and designations.  Moreover, beginning on June 30, 2022, Defendants failed to provide any wage statements whatsoever to Plaintiffs and members of the California Wage Subclass.

144.   Defendants are liable for the foregoing violations because they constituted Plaintiffs and class members' employer within the meaning of the California Labor Code.

145.   Plaintiffs and members of the California Wage Subclass were harmed by the defective wage statements.  The defective wage statements prevented Plaintiffs from identifying the true name of their employer, from determining their appropriate deductions and learning that NTE and StreetTeam had failed to provide promised benefits, and from calculating the amounts owed them.

## ELEVENTH CAUSE OF ACTION

### (Fraud)

### *On Behalf of Plaintiffs and the Wage Class Against All Defendants*

146.   Plaintiffs repeat and reallege each of the foregoing allegations as though fully set forth herein.

147.   From May to August 2022, the Pollen entities and Callum Negus-Fancey made a series of false representations of fact and false promises to Plaintiffs and the Wage Class.

### False Representations About Payroll Delays

148.   NTE and StreetTeam repeatedly missed normal payroll from December 2021 through June 2022.  During this time, Pollen leadership repeatedly blamed their

payroll processor, TriNet.  TriNet was not responsible for the delays and, on information and belief, the delayed and missed payroll was due to Defendants' undisclosed financial distress.

**False Representations Regarding Ability to Pay and Resumption of Normal Payroll and Benefits**

149.    After the Pollen companies fell behind in payroll, starting in late June 2022, their representatives made a series of false representations regarding their ability to pay employees' wages going forward.  These representations included, without limitation, the following:

a.    When Pollen's CEO, Callum Negus-Fancey publicly reported that the missed June 30, 2022 payroll was an "isolated, one-off event" and when asked if Pollen could continue to make payroll, he represented "yes, absolutely we can."

b.    In a series of messages posted to the company Slack platform on or about July 5, 2022, Chief People Officer, Anne Bedi, wrote to all staff that employees would continue to receive ordinary payroll shortly, that payroll would resume imminently through the ordinary payroll system, and that "your benefits are being handled by TriNet and are unaffected."

c.    On July 15, 2022, Ms. Bedi represented in an email to all staff that Pollen was working to deliver the July 15, 2022 paycheck "next week" and that "[f]rom that point on, payment schedules will be back to normal."  Ms. Bedi also represented that employees would receive an extra paycheck once normal payroll resumed.

d.    On July 21, 2022, Ms. Bedi wrote to all employees that they would receive their next paycheck "next week rather than tomorrow," and "[f]rom then on wee will be back on or normal payroll cycle."

e.    On July 29, 2022, Ms. Bedi wrote to all employees that it was "very likely" that Pollen would join the health insurance of its "new partner," and that Pollen would "continue to cover the portion of your health insurance premium that we

normally pay, plus the 2% Cobra fee."

**False Representations About Potential "Partnership" or Acquisition**

150.   From July into August 2022, the Pollen entities and Mr. Negus-Fancey continually represented to employees that they were in the final stages of a transaction that would allow the Pollen entities to pay all owed wages.  These representations included, without limitation, the following:

      a.    On June 30, 2022, Callum Negus-Fancey posted a companywide message on the Slack platform, representing that he was working to "get them to wire funds" and that "everything is agreed with them … so our shareholders are now happy to fund.  We will make sure to get this to you as fast as possible and really recognize how difficult pay being even a couple of says late can be."  He went on, "I assure you this [missed payroll] will never happen again."

      b.    On July 13, 2022, Mr. Negus-Fancey wrote in an email to all employees that Pollen had "reached the final stages of negotiation with one of the largest entertainment companies in the world."

      c.    On July 14, 2022, Mr. Negus-Fancey represented to all employees that he hoped to "complete [negotiations] over the weekend," which would "bring a huge amount to Pollen."

151.   Each of these representations was false.  The Pollen entities had no reasonable prospect of resuming normal payroll and had, in fact, terminated all employee benefits in June 2022, a fact that they actively concealed from employees.  Further, even if the Pollen entities completed the contemplated transaction or "partnership," it would not have generated nearly enough money to pay the outstanding wages and benefits owed to employees, in light of other outstanding obligations.

152.   The Pollen entities and Mr. Negus-Fancey knew these representations were false when made.  They knew that normal payroll could not and would not resume, and that benefits had already been terminated.  They further knew that the

contemplated transaction would only yield a fraction of the money necessary to cover the missed payroll and other obligations.

153.   The Pollen entities and Mr. Negus-Fancey intended Plaintiffs and the Wage Class to rely on the representations.  They made the false representations for the specific purpose of inducing employees to continue to work without pay, while they arranged to sell the company.

154.   Plaintiffs and the Wage Class reasonably relied on these representations. They had no reason to believe that the representations were false.  When employees contacted senior executives to inquire further about the representations, the executives continued to reassure them that normal payroll would resume, and that the late payroll was a minor setback.

155.   Plaintiffs and the Wage Class were harmed by this reliance.  They continued to work from July 1, 2022 through August 10, 2022 without pay or benefits in reliance on these false representations.  This amounts to wage theft through false pretenses.

156.   Plaintiffs' reliance on these false representations was a substantial factor in causing this harm.  But for this reliance, Plaintiffs would not have lost out on their earned wages and benefits.

157.   Defendants are liable for the fraud committed against Plaintiff and the Wage Class. On information and belief, Defendants conspired with the Pollen entities and their officers and directors to make these false representations in order to induce employees to continue working so that efforts to sell the company would continue. At minimum, Defendants received the benefit of the fraud in that it caused employees to continue working without pay so that the Pollen entities could pursue the sales efforts demanded by Defendants.

//

//

//

COMPLAINT

**TWELFTH CAUSE OF ACTION**

**(Failure to Pay Wages Timely in Violation of NYLL § 191)**

***On Behalf of Plaintiffs and the New York Wage Subclass Against All Defendants***

158.   Plaintiffs repeat and reallege each of the foregoing allegations as though fully set forth herein.

159.   The timely payment of wages provisions of NYLL § 191 apply to Defendants and protect Plaintiffs and the New York Subclass.

160.   NTE and StreetTeam failed to pay Plaintiffs and members of the New York Subclass on a timely basis as required by NYLL § 191.  Defendants are liable for this non-payment because they were Plaintiffs' employers within the meaning of the New York Labor Law.

161.   Plaintiffs and members of the New York Subclass were not exempt from the requirement that NTE and StreetTeam timely pay them for all hours worked under the NYLL.

162.   As a result of the failure to timely pay Plaintiffs and members of the New York Subclass their wages for all hours worked, NTE and StreetTeam, and by extension, Defendants, violated the NYLL.

163.   Defendants' violations of the NYLL have significantly damaged Plaintiffs and members of the New York Subclass.

164.   Plaintiffs and members of the New York Subclass were harmed by the defective wage statements.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and similarly situated employees, pray that the Court enter judgment in their favor and against Defendants, containing the following relief:

1.   That the Court determine that this action is maintainable as a class action pursuant to Federal Rule of Civil Procedure 23 and a collective action under the FLSA, and certify it as a class and collective action;

2.      For damages according to proof a trial, including earned and unpaid wages, minimum wage, overtime, vacation time, severance, insurance benefits, and reimbursement of expenses;

3.      For pay and benefits for the 60 days (or, in New York, 90 days) following Plaintiff and other employees' layoffs, and associated penalties for failure to provide sufficient notice of layoffs;

4.      For penalties and liquidated damages as provided by statute;

5.      For actual and liquidated damages pursuant to the FLSA;

6.      With respect to the Severance Subclass only, for rescission of the severance agreements and a declaration that the obligations therein are no longer binding on members of the Severance Class;

7.      For attorney's fees and costs including, without limitation, under 29 U.S.C. §§ 216 and 2104, NY Lab. Law §§ 198 and 663, California Labor Code §§ 218.5, 226(h), 1194, 1404, NRS 608.140, Fl. St. 448.01, Ga. St. § 34-4-6, DC Code §§ 32-1012 and 32-1308, Mo. Rev. St. § 290.257, 820 ILSC 105/12 and 115/14, Mass. Gen. Law, ch. 151, § 20; RI Stat. §§ 28-14-19.2 and 28-14-20(e);

8.      With respect to the Severance Subclass, for attorney's fees as provided by the severance agreements;

9.      For punitive damages on account of Defendants' willful, malicious, oppressive, and fraudulent conduct;

10.     For costs as provided by law;

11.     For prejudgment interest; and

12.     For such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues of fact and damages.

Dated: April 14, 2025

Respectfully submitted,

/s/ Damion Robinson
Damion D. Robinson (SBN 262573)
dr@robinsonmarkevitch.com
ROBINSON MARKEVITCH & PARKER LLP
8430 Santa Monica Blvd., Suite 200
West Hollywood, CA 90069
Tel.     (424) 278-2335

WIGDOR LLP
Valdi Licul (Pro Hac Vice)
vlicul@wigdorlaw.com
Meredith Firetog (Pro Hac Vice)
mfiretog@wigdorlaw.com
William Baker (Pro Hac Vice)
wbaker@wigdorlaw.com
85 5th Avenue, Floor 5
New York, NY 10003
Tel. (212) 257-6800

Attorneys for Plaintiffs and the Classes
and Subclasses

COMPLAINT